Cosmetic Gallery v. Schoenemann Corp Good morning. Good morning. May it please the Court. I'd like to reserve four minutes for rebuttal. My name is Stephen J. DeFeo. I represent the plaintiff and opponent, Cosmetic Gallery Inc., which does business as the salon of image beauty. In this case, the defendant is Schoenemann Corporation, which does business as Schoenemann Beauty Supply. Also, Dale Schoenemann, principal of Schoenemann Beauty Supply, is a defendant here as well. The principal in Cosmetic Gallery is Mr. Chip Eisenberg. This is a case involving hair care products and cosmetic products and the business interests of Chip and Dale. We're here today to determine whether the district court committed an error when it granted summary judgment on the defendant's motion for summary judgment in this Group Boycott case. Did it really Chip and Dale? It really Chip and Dale, Your Honor. The district court did a few things here which we believe were an error. First of all, we believe, although it cited to the Rossi decision, it did not properly apply the Rossi decision. That's Rossi v. Standard Homes, which is cited throughout both briefs. In addition, by failing to properly apply the Rossi decision, it appears that the court relied on the intervest decision and rendering its decision, analyzing the case under what's called the conscious parallelism, conscious parallel standard, which we believe did not appropriately apply in this particular case. Finally, the district court, even if it applied, even if the conscious parallelism test is the appropriate test, it did not apply it correctly here. And it reached a conclusion about group boycotts, or at least the group boycott in this case, that we have found no authority for and, frankly, we do not understand. And that is the concept that the district court referred to where the court concluded that because the defendants made a decision not to sell their products to Cosmetic Gallery at some point before other co-conspirators joined in the boycott, apparently, according to the district court, there could not be concerted action under those circumstances, and as a result, summary judgment was appropriate for the defendants. Well, but it's possible that they were acting independently. They all had similar kinds of distribution agreements, did they not? It's absolutely possible that they acted independently, Your Honor, and they did have different distribution agreements, and they did have different salon agreements. Well, but there were similarities in those agreements. There were some similarities, but they were by no means a form contract that had the exact same terms in terms of the restrictions, the vertical restrictions placed on the sales of the product between distributors and retailers. Were there material differences in terms of their getting in trouble with the manufacturers? We believe there were. And in dealing with the salons as well? We believe there were material differences. In fact, some of the product lines have two product lines. One product line can be sold to anybody that has a salon. Another product line, for example, can't be sold to a salon unless that salon, for example, does a sufficient amount of sales or restricts itself to one or two types of brands. The idea is this distribution scheme that's used between manufacturers, suppliers, and the salons is different depending on who you ask, when you ask, and what you ask. They don't have a uniform model. Now, there's actually been testimony in this case that there were efforts to develop a uniform salon contract and uniform distribution agreements. Well, guess what? That never came to fruition, not surprisingly. Different manufacturers and different suppliers have different motivations about the level of sales they want and the cachet or the niche they want for their products. They're certainly entitled to do that. They're certainly entitled to restrict how their products are sold vertically. And this is a horizontal claim. And this is a claim that the defendants engaged other distributors to prohibit sales to us, that is, to Cosmetic, of products that Cosmetic needed to expand its business. We believe there was a sufficient amount of evidence presented before the court below that, when provided with the legitimate inferences from that evidence, were sufficient to overcome the summary judgment standard. It appears, from what the court did below, it made the conclusion that simply because the defendants reached a determination not to do business with the plaintiff at some point, and then later others engaged in the same conduct, and we believe as a result of conduct by the defendants, the district court seemed to reach the conclusion that that didn't matter. Apparently, under the district court's analysis, once somebody makes a determination not to sell, it sounds like all bets are off. It's unclear from the opinion because it's only a couple of paragraphs in the decision where the court really gets to the merits of the case. But you don't disagree that the distributors had a contractual basis for not dealing with Cosmetic? The distributors had – we don't agree with that, Your Honor. The distribution agreement said you should not do business with diverters who do not have a salon in their premises. What the court has to understand is the premise of this entire conversation, this entire effort to obtain products, was that Cosmetic Gallery was in the process of putting salons into its establishments and opening new establishments. It did not – But in the process, it's different from having it there. It certainly is, Your Honor. And the presumption was, when I get my salons open, when I get my salon store set up, I want to do business with you because that's what you tell me you require. That was the entire premise upon which Mr. Eisenberg went to the defendants in this case. Well, maybe this is not right then for a decision because you did not have a salon operating on the premises. Ultimately, Your Honor, by July of 2001, Mr. Eisenberg did have a salon operating on one of his premises. The concept was, in late 2000 and early 2001, Mr. Eisenberg made the decision to go to a salon store model where we would have not only salons but also a retail to sell products. Were you doing business with the required percentage of business to qualify for the distribution? It depends. The short answer is it depends, Your Honor, because the contracts don't all have the same provision, and some of them don't even have a provision, as I understand it, requiring a particular percentage of split. That's one of the problems with this case. The defendants used the salon contracts and the distribution agreements in an attempt to cover over their conduct and say, we couldn't. We couldn't. The contracts say we couldn't. Well, that's not true. Number one, the contracts don't say that. Why don't they say that? It sounded pretty clear to me. Tell me why. There hasn't been an allegation, a claim, or any evidence to establish that Mr. Eisenberg ever received products as a salon or a distributor pursuant to a distribution agreement and then sold the products improperly. That is not in this case. What the distribution agreements and salon agreements typically say, really the distribution agreements, is if you've done that kind of thing, we're not going to do business with you anymore. Mr. Eisenberg has been in this industry for 25 years. He's been selling hair care products, cosmetic products, fragrances, et cetera. In 2000 and 2001, he started to move toward a salon store concept, a salon store model, where he would have salons and retail space. This, he believed, based on his understanding of his discussions with some of the suppliers and manufacturers, would allow him to receive the products and sell the products as part of his salon effort and as part of the retail. Even given your future plans, present and future plans, do distributors not have a right under their agreements to not distribute to one who has been known as a diverter? I don't believe the distribution agreements say that. To the extent there's sort of a U.S. versus Colgate analysis here where somebody can decide who to do business with, I certainly believe that that's part of our law and that's part of the business community. There's no question about that. That's not our fight here, really. No, our fight is this. Our fight is we believe that once the defendants learned that Mr. Eisenberg was going to engage in the salon store model, he was going to be a direct competitor with a number of Mr. Shannon's stores. He's got professional stores. He's got beauty bar stores. He's got outlets for hair all in a similar area over in New Jersey to Mr. Eisenberg's store. Mr. Eisenberg is known to be a price discounter. He sells cheaper. The margins on these products are astronomical. Good for them. Mr. Eisenberg's business model is to take the products, and although he can still make a comfortable profit, he cuts the prices lower than a lot of other people in the area so that he can do more volume, so that he can service his clients. That posed a direct threat to Mr. Shannon's stores and salon stores in the area where Mr. Eisenberg fit in. Mr. Shannon knew, and he still knows, that some of the most popular lines in this area are the Nexus and Matrix lines, which he has the exclusive right to distribute in the South Jersey area. They're his. That's the deal he's got from the manufacturer. The only place that Mr. Eisenberg could get those in order to provide them to his customers and fill up his shops was through Mr. Shannon. Mr. Shannon basically had the whole thing under wraps. Certain other distributors also had some of the very popular lines in the South Jersey area. John Paul Mitchell was one. Redkins and other, Artec, some of the other lines. Some manufacturers sold directly, though. Yes, they do. Not through wholesale distribution. Yes, they do. Frankly, Your Honor, I believe there's more of that in the industry now than there has been in the past. That's sort of an evolution that's taking place as I understand it. But the typical model is manufacturer, distributor, salons. Now, the Shannon organization is a little unique. Although they're a distributor for certain lines, they also manufacture their own line. They also own professional stores where they sell to salon owners and others with cosmetology licenses. And they also own dozens of stores that are called the beauty bar stores, which are salon stores with salons and a high retail section in the front. Basically a similar model to what Mr. Eisenberg wanted to do. The difference is since the Shannon organization has this product cradle to grave, so to speak, from the start to the end, they're able to control it. And with the help of others in the industry, they took steps to prevent Mr. Eisenberg from obtaining the products he needed to open his salon stores in 2001. Mr. Eisenberg ultimately did open one of those stores, but he lost leases on other properties because he knew that he could not provide the public with what they needed, the popular brands, and a sufficient amount of them to cover what he would need to to make money in the business. Your theory is that Mr. Shainman orchestrated a boycott because you were, in fact, competing with some of his stores. Yes. Is that correct? Yes. But, in fact, wasn't Shainman selling to stores that were competing with him already? I mean, doesn't that undercut your theory that he was orchestrating the boycott in order to get you out of business? I understand the point, and to a certain extent he was, but to a certain extent he really wasn't. Mr. Shainman's bread and butter is thousands of salons, mom-and-pop operations, as they call them. You may know them. It's Betsy's Salon downtown where maybe they have two chairs and somebody goes in for a hair and a wash and whatever, and they have a little bit of product out front. You can walk down any street and see these kinds of places. Walk down the streets of Philadelphia, you'll see them all over the place. The model that Mr. Shainman operates and that Mr. Eisenberg was trying to get to in 2001 was a little bit more sophisticated than that. It would have a larger retail establishment because people love to and need to buy product more frequently than they necessarily need treatments, but it would also have the treatment section where you would have 2, 3, 5, 10 chairs or whatever was necessary to fulfill the needs of your customers. I see my time is up, but I want to make sure I address whatever questions. Another three minutes. Okay. There are other larger salon store models. Some are called Alta, which are just enormous stores with a tremendous amount of retail and a huge salon section. That's a newer model that's developed probably in the 1990s. That's at one end. You have the mom and pops at the other end, and then you have this niche of the sort of in-between salon store model where you can get the retail product with some diversity, different brands, different types of product, but you can still get the treatments. Could you get back to that one point? Why would Shainman go through all of this, make all of these calls to get all of these people to stop dealing with you? Was it because you were really posing a threat to his business? Number one, I don't think it was that hard for him to do. We're talking really about two people that are major players in this industry, the headlines that Mr. Eisenberg needed. One was the Emiliani line, and the other was from East Coast through Mr. Stan Klett. I do believe that Mr. Shainman perceived the threat that Mr. Eisenberg was making on his business because, frankly, Judge, I don't know of salon store models operating in the South Jersey area other than the Beauty Bar, except for the big ones, the Ultas, which are a much different model. Chip Eisenberg was a price discounter. Price discounters are not good for people that sell at full value because why should they go to Cherry Hill and pay full value for a product which might be 30% or 40% more when they go down the street and get the same product 30% or 40% off? If it's the same product, if there's a sufficient number of them, if they have all the lines that are required for the person's needs, that was a niche that Mr. Eisenberg was ready to move into, develop, and exploit, and Mr. Shainman, quite frankly, realized that that was a competitive threat to his business. He took steps as outlined in our brief through the facts that we've submitted, including contacting Ms. Urban, sending a do-not-sell memo, taking steps to ensure that Ms. Urban communicated with Mr. Emiliani about Mr. Eisenberg's intentions. East Coast is a very large customer, or actually Shainman is a very large customer of East Coast. Shainman buys products from East Coast to put in their beauty bar stores. These interrelationships were used and exploited by Mr. Shainman for one simple purpose. Keep the discounter out. Don't want him. He's not good for you. He's not good for me. He'll cut into our margins. Great business strategy. Unbelievably well executed. Unfortunately, we believe it's illegal. Well, I understand your argument that you posed an economic threat, and that's why Mr. Shainman apparently orchestrated this boycott, but they also had agreements with distributors that said, if you do sell to a diverter, we're not going to deal with you. So weren't they just as motivated, if not more motivated, by breaching their own agreements with the manufacturers? That is the argument, Your Honor, but respectfully, the agreements don't say that, number one, and the diverters they're talking about are people, and the agreements, as I read them, are people who have been under salon contracts in the past, purchased products through the approved line, and then diverted, that is, sold to others who they were not supposed to. That is not what Mr. Eisenberg has done in the past. In addition, Your Honor, those agreements are, to say they are irregularly enforced would be kind. There have been admissions in this case that Mr. Shainman used to sell to Ulta, which, as he claimed, they were a big retail store, they put chairs in the back. He also sold to an individual named Gullows, who in the past had been a diverter. There are no rules here, just exceptions, apparently, and to use that as the basis to exclude Mr. Eisenberg we think is inconsistent with the facts, and we believe it is not sufficient for them to offer this explanation, and for the district court to accept it and say, fine, we take your explanation, summary judgment is granted. That was the error, Your Honor. Good. Thank you very much. Thank you. Mr. Rubin. Good morning, Your Honor. Good morning. May it please the court, Burt Rubin on behalf of the defendant, Appellee Shainman. I want to turn back the clock to early 2001, when Mr. Eisenberg calls Mr. Shainman and says, I want you to sell to me. At that time, he's got two stores. Doesn't have a salon in either one of those two stores. At that time, he's got a 20-year track record of engaging in extensive sales, extensive, extensive sales, of diverted product. At that time, he's also selling diverted product over the Internet. He's got an Internet site, and he's using various gray market sources, and there's nothing illegal about his ability to obtain product from those who are willing to sell to him, but there is no obligation on the part of Mr. Shainman to sell to somebody who at that time has engaged in diversion of salon-only brands. Now, Mr. Eisenberg says, look, I'm planning a new bottle. I'm going to clean up my act. I'm going to open a new store, and what I'm going to do is put a salon in there. Well, as Mr. DeFeo said, that didn't happen until July of 2001. Even after he opened up that store, he told his accountant that the reason he was opening that store was so that he would have a salon and get salon-only brands that he could then send to his other two stores. Now, is it a pretext? Is it, as Mr. DeFeo says in his briefs, and after the fact justification that's contrived by Mr. Shainman, that he's not going to sell because of purported concern about the manufacturers, we submit that it was not pretextual. It was very real. In fact, the contemporaneous notes that are set forth in the record, and in particular I would direct the Court's attention to the letter that was sent by the original attorney for Mr. Eisenberg, Mr. Levin, to Mr. Shainman on April 30th, 2001. He sends that letter. That letter is 1414 in the record. He sends that letter not to other distributors, saying, look, Eisenberg is threatening me with litigation. What are we going to do? We've got to sell to him. We shouldn't sell to him. No, he sends that letter to manufacturers. He sends it to Ms. Urban, who is an independent sales consultant who is engaged with companies who are concerned about diversion. He sends that letter to Mr. Schuster at Nixus. He sends that letter to Mr. Campbell at Matrix. He doesn't send that letter on to other distributors. He doesn't pick up the phone and call the other distributors. And in fact, Your Honors, let's talk about the evidence. I want to talk about Max Ruschita and Monsanto, two cases that Mr. DeFeo didn't mention, but which Judge Kugler correctly applied. Is there any direct evidence in this record of a conspiracy to boycott Mr. Eisenberg? I submit, Your Honors, there was extensive discovery over a period of three or four years. That record is voluminous. He had ample opportunity to take every deposition, to ferret out every document. And when you go through plaintiff's briefs, what I find remarkable is, unlike many other conspiracy cases that this Court has seen over the years, there is not a single meeting between Mr. Shainman or anybody from his company and any of the other three distributors with which they allegedly conspired. There's not even a single phone call that's alleged by the plaintiff between Mr. Shainman or anybody else from his company on the one hand and anybody from Emiliani or East Coast. The only phone call between Mr. Shainman and any of the other three distributors is a call that Mr. Shainman made to Mr. Mancini at Goldwell, returning Mr. Mancini's call. Mr. Mancini, in June, had gotten a call from Mr. Eisenberg saying, Hey look, I really want Goldwell to do business with me and I know you've got concerns about diversion, but let me satisfy your concerns. I'm doing business with Shainman and I'm doing East Coast and I'm going to meet with them out in Las Vegas at the convention. So if they're satisfied that I'm not a diverter, then you should be satisfied too. Well, Mr. Mancini, after getting that call from Mr. Eisenberg, was appropriately skeptical and he picks up the phone and he calls Mr. Shainman to say, Look, I just got a call from Chip Eisenberg saying he's doing business with you. Is that true? And you're going to meet with him in Las Vegas? Nothing wrong about that phone call. Essentially, Mr. Eisenberg was using Mr. Shainman as a reference as to his purported cleaning up his act. And Mr. Shainman responds, No, it's not true. I'm not doing business with him and I'm not going to meet with him in Las Vegas. End of phone call. There's nothing in the record that shows that Mr. Shainman urged Goldwell or Mr. Mancini, as a representative of Goldwell, not to do business with Mr. Eisenberg. Did Mr. Mancini then speak to Mr. Eisenberg and tell Mr. Eisenberg that Shainman said not to do business with you? No. You're a diverter? But isn't that the statement of Mr. Eisenberg? Yes, Your Honor, there is double hearsay testimony by Mr. Eisenberg and Mr. Eisenberg's employee in which they claim, contrary to the testimony of Mr. Mancini, his boss Aaron Frankel, and to the testimony of Mr. Shainman himself, Mr. Eisenberg says, Mancini told me that Shainman told him that he had organized a boycott against Eisenberg. We submit, Your Honors, that that is double hearsay. That is not covered by the hearsay exception for two reasons. But doesn't it explain why Mancini will not do business with Eisenberg? No, Your Honor, there was testimony, undisputed testimony in the record that even before that phone call, in April of 2001, the sales representative, Ms. Pesetti, had gone out and had looked at Mr. Eisenberg's two stores and had not found a salon there. And again, in June of 2001, Ms. Pesetti, as well as Mr. Mancini, had gone out and had found that none of the three stores, including the new store, had a salon operating. And Mr. Frankel, who is the President, testified, I made the decision. He wasn't selling my product because, A, he's a diverter, and B, he doesn't have a salon. Much less does he satisfy the thresholds that are set forth in these distribution agreements. Was Eisenberg in the process of establishing a salon in one of the stores? He was in the process of setting up a salon in the third store, which didn't occur until July of 2001. Would that have qualified him to receive a product? No. For instance, the product that he talks about the most, that he said was the most valuable to him, was Matrix. If you look at the record, Your Honor, you'll see that the Matrix requirements, both of the distributor and then in the salon contract, that Matrix requires distributors to have the salon customer sign, provides for at least $100,000 in salon sales, which they didn't have. They didn't have it in 2001. They didn't have it in 2002. And also it has to have at least 50% of their total revenues coming from salon sales. They didn't have that either. So the fact of the matter is that this is a case where the court found, at most what the plaintiff has shown is conscious parallelism, that he approached a number of distributors in the spring of 2001 when he had two stores that did not have salons in them, plans to open a third store with a salon, but that was it, just plans. It hadn't happened yet, and refusals to deal on the part of the various distributors. There is nothing in terms of the circumstantial evidence that tends to exclude the possibility of independent action by the distributors, which was fully consistent with their economic interests. Well, explain that to us, because Mr. DeFeo claims the contracts say something differently than what you represent. Well, Your Honor, I will let the contracts speak for themselves. They're in the record. I don't think they could be any more elusive about the requirements that are imposed on the distributors, number one, and then number two, that the distributors require the salon customers to sign. I think they're very explicit that the people who want to buy from the distributors have to have an extensive amount of revenue derived from salon sales, whether it's 30% or 50%, but a substantial amount that Mr. Eisenberg just never even came close to. Number two, in terms of economic interests, the distributors, such as Mr. Shainman, had a dual concern. On the one hand, they were legitimately concerned about being cut off or having their distribution agreements terminated by the manufacturers. I think it's important, although Mr. DeFeo approves the distribution agreements, their brief at page 10, their opening brief, acknowledges that Mr. Eisenberg went to great lengths to protect the anonymity and confidentiality of his sources because, on occasion, manufacturers and distributors would intend to take actions against individuals who sell EPBs outside the manufacturer's approved channels of distribution. So this is, in fact, consistent, indeed, the plaintiff acknowledges it, with our interpretation of the agreements, that the manufacturers indeed take actions against distributors who sell to people like Mr. Eisenberg, who sell outside the normal chain of distribution. Now, in terms of the economic interests, not only are distributors concerned about the manufacturer, they're also concerned about their salon customers. The salon customers, whose goodwill they had built up by selling to them, would understandably be very upset with the distributors if they sold to somebody like Mr. Eisenberg, who is essentially a free rider. And this court has made clear that there is no obligation on the part of a distributor or a manufacturer to sell to somebody who's engaged in free riding. The core principle that the plaintiff seems to overlook in this case, and that the district court correctly recognized, and it's been the law for over 100 years, is that a company has a unilateral right to do business with whom it wants to do business. And that even if they didn't have the distribution agreements, if it just didn't like Mr. Eisenberg, he didn't have to do business with him. But there is no evidence in this record that Mr. Shaneman met with anyone, talked with anyone to dissuade them or to induce them to refuse to do business. Did you circulate an email that said something like, don't sell to Eisenberg? Yes, in fact, that to me, I think, epitomizes the dearth of evidence in this record. For the plaintiff to cite to that memo or email, sent in March of 2001, I think really captures the paucity of evidence here. That memo was sent by Mr. Shaneman to his own sales staff. It wasn't sent to any other distributor. There was nothing improper at all by Mr. Shaneman telling his sales staff, don't sell to Mr. Eisenberg, he's a diverter. And for the plaintiff to rely on that, I think, speaks volumes as to the paucity of their evidence. Conscious parallelism, I want to address a point briefly that was made by my colleague. He said that the conscious parallelism test that was applied by Judge Kubler doesn't apply in a group boycott case. With all respect, I would suggest that there are a number of cases from this court, we've cited them in our brief, InterVest, I think, being the most recent one, where while the plus factors are generally required and you see them most often discussed in the context of price-fixing cases, this court has never held or even suggested that it is confined only to a Section 1 price-fixing case. The Schoenkopf case, the Venzi case remain good law. And there are no plus factors here. The actions were not contrary to their own economic interests. They were fully consistent. Let's talk about the alleged motive. One of the things that Matsushita says is you've got to look at whether there's a plausible motive to conspire. They talk about the beauty bar. As we pointed out in our brief, Mr. Shaneman had a 50% interest in a company which had a number of salons. One was called Outlooks for Hair and another group of salons was called Beauty Bar. In South Jersey, there was one Beauty Bar salon. It was in Cherry Hill, which is not too far from Mr. Eisenberg's Marlton store. When was that store opened? 2002. 2002, after this lawsuit was filed. It doesn't make any sense that Mr. Shaneman was going to organize a group boycott in early 2001 to protect a store that wasn't open until the following year from price competition when, in fact, as Your Honor has recognized, Mr. Shaneman is making sales to thousands of salons around the East Coast and South Jersey, including Price Cutters. We've cited those in the record. Nor does it make sense that the other distributors, who don't have any interest in Beauty Bar, two of them either make no sales to Beauty Bar or de minimis $4,000 worth of sales, are going to engage in a boycott in violation of antitrust laws and subject themselves to the kind of enormous expense and burden that has been foisted on Mr. Shaneman by this litigation. You're urging me that we use the collective parallelism standard that the district court... Yes, Your Honor. I submit that the conscious parallelism test fully applies here because all that the plaintiff is relying on, indeed, in this record is the fact that he approached a number of distributors in the spring of 2001 and they all refused to do business with him. I understand. I know your time is up. Just one quick question. Is there a big difference between that test and the Rossi test that the appellants are arguing for here? No. Rossi was a direct evidence case. Rossi, the court found, and Judge Becker cited some testimony by one of the witnesses, that two of the distributors got together and they explicitly said, we are going to do everything within our power to make sure you go out of business. We're going to cut off your supplies. We're going to lower our own prices. And so what the court did was it said, look, once you have direct evidence, you don't need to get into Matsushita and Monsanto and the plus factors and all of that that deals with circumstantial evidence. We've got direct evidence. There is no direct evidence in this case. All they've got is contemporaneous refusals to deal by a number of distributors who independently decided, look, why should we expose ourselves to possible sanction by the manufacturers? Why should we expose ourselves to alienating our good customers? We don't want to do business with them. We don't have to do business with them. There's no evidence in this record and it's an extensive record. And I urge the court to very carefully check the citations in counsel's brief, because unfortunately, in many respects, they don't necessarily jive with the assertions that are being made. Thank you. Any questions? Thank you very much, Mr. Rubin. Mr. Bethea. Thank you, Your Honor. May it please the court. Mr. Rubin talked about facts and he talked about law. I'd like to talk about the law briefly for a second. The Rossi case did have some direct evidence, but Judge Becker went to some great lengths to discuss the circumstantial evidence as well. I would request that the court review Rossi and the parallel that it has to this case in terms of what the evidence was that was presented by the plaintiff to get past the summary judgment motion. The court's question about whether the conscious parallelism test is that much different from the test in Rossi, I'm not sure what the answer is to that. But I think what's important to note here is that the plaintiff here has demonstrated the same type of evidence, if not more, than the plaintiff did in Rossi. There was a threat in Rossi some 10 years before the Third Circuit decision, some years before the individual opened his business. That's true. There were also a number of circumstantial facts, including monitoring of the plaintiff, keeping an eye on him, and some other comments that were made. In this case, Your Honors, the statement has been made that there were no communications between Mr. Shainman and anybody else, any of the co-conspirators. We believe that's wrong. First of all, Mr. Shainman specifically sent the letter that Mr. Rubin discussed, which came from Mr. Eisenberg's counsel, sent it to Mr. Shainman. Mr. Shainman gave it to Ms. Urban. Ms. Urban is the person who's responsible for monitoring sales and distribution and diversion. She also has a relationship with Emiliani. She does work for them. The very next day, the very next day, from the day that Mr. Shainman received the letter from Mr. Eisenberg's counsel, it was in the hands of Ms. Urban, it was on Mr. Emiliani's desk, and the contract that Mr. Eisenberg had with Emiliani was terminated. Coincidence? I suppose that's possible. But really, do we really think that was coincidence? When one of your old friends in the industry sends a letter that says, hey, look what this guy's doing, is this really going to happen? And Patty Urban, who's got a relationship with both of these individuals, which they both knew, gets it on to Mr. Emiliani's desk. What's the very next thing that happens? Mr. Eisenberg is terminated. That could be a coincidence. It doesn't really seem like it is. In addition, there's an email that Mr. Shainman sent himself to L'Oreal, the owner of Sunville Lines, sometime in the midst of this litigation, saying to L'Oreal, hey, do you have Eisenberg on your list of diverters? Because I know we've got this list of diverters, but I don't see him on there. Is he on that list? Because if he was, it would give us a reason not to sell to him. Mr. Shainman wrote that letter during the course of discovery in this case. That letter was not received from Mr. Shainman in discovery. We got it on a third-party subpoena to L'Oreal. Could it also be Mr. de Feo to confirm his own suspicions that Mr. Eisenberg was the diverter? I suppose it could have been, Your Honor, but why would he ask the question, if you have this information, it will give us some reason not to sell him? It seems to me that Mr. Shainman has a bona fide reason not to sell or he doesn't. He doesn't need to go to L'Oreal and ask that question four years into the litigation. It just doesn't make any sense unless the goal was to find something to help him explain what his position is in this case. The court mentioned the do-not-sell memo. That's true. It was sent to Mr. Shainman's employees. We don't know where else it might have gone, but it was the only do-not-sell memo that Mr. Shainman has ever written in 40 or 50 years being in this business. Coincidence? I suppose it could be, but we don't think it is, Your Honor. We think this was an effort by Mr. Shainman to keep Mr. Eisenberg out of this area because it's profitable for him. He doesn't want a price discount in here. Does it have any significance if it only went to his people? I suppose it shows his intent, Your Honor, and his motivation. I don't know that we can demonstrate that the others had access to it, that's for sure, but again, part of the theory here is what is Mr. Shainman about? What is he really doing? We're trying to glean intent from facts. Unless you look at these facts holistically, through the timeline and through what was going on in early 2001 when Mr. Eisenberg was trying to open a store, none of these facts make any sense or matter alike. It's the same thing in Rossi, though. Any one of those individual facts really wasn't strong enough. Maybe the threats could have been, maybe not, but you've got to look at the whole picture and you've got to give the plaintiffs the legitimate inferences from those facts. The conscious parallelism doctrine is used to stop situations where you have similar pricing and somebody jumps into court and says, ah, there must be a conspiracy. That's not what happens in pricing situations. Go down the gas station. As you drive, you'll see all the gas is priced very similarly. Why? Is that an antitrust violation or is there a conspiracy? Probably not, according to the economists. There's reasons for that, and we don't want to go overboard and make that type of business subject to antitrust claims. That's not what we have here. We have a different situation where we just need to look at the inferences to be drawn from the facts we've presented. Admission by Shainman that Mr. Mancini recants on now about what he did to prevent Cosmetic from getting products. The letter that went to Shainman that goes to Liliani, the next day Eisenberg gets cut off. The relationship between Shainman and East Coast, where East Coast sold the most. Shainman was the largest buyer of East Coast products for its beauty bar. The fact that the beauty bar ownership was kept silent from the salon owners. We heard today that Mr. Shainman wants to protect his relationship with the salon owners. Well, he may, but he has a funny way of doing it when he opens up a beauty bar store right down the street from his salons, his salon customers, and he doesn't tell them he's the owner of that business. Your Honor, we believe Mr. Shainman was trying to move in this direction with the salon stores, as with Mr. Eisenberg. He didn't want a cost cutter involved, and he succeeded in keeping him out of the market. Thank you. Thank you. We thank both lawyers for an excellent argument and excellent briefs. The court would like to have a transcript made of the argument, and you would kindly share the costs and arrange for that with the clerk's office before you leave. Again, the court thanks you very much. Take the matter under advisement. Please rise and stand for the recess prior.